# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TANYA DUNN,** | : | **Civil No.  1:21-CV-91** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.    Introduction

The regulations that govern Social Security disability determinations recognize several immutable facts. As we age, our capacity to learn new things and undertake new tasks declines. Thus, the Commissioner of Social Security has promulgated guidelines on disability determinations that account for a claimant's physical abilities, age, education, and vocational skills as well as other factors, such as their residual functional capacity ("RFC"). See 20 C.F.R., Part 404, Subpart P, Appendix 2. These guidelines prescribe various grids, and persons who fall within the grids may be defined as disabled by application of these rules.

Tanya Dunn's case implicates these medical-vocational grids since Ms. Dunn was a in her 50's at the time of the alleged onset of her disability, making her a

1

worker closely approaching advanced age under the Commissioner's regulations. Moreover, Ms. Dunn had a limited education, having never completed high school. Therefore, if Dunn was limited to performing sedentary work, under these medical-vocational guidelines she would be deemed disabled.[1]

In Dunn's case, the only physician who actually examined her and opined upon her medical condition concluded that she was limited to sedentary work due to the combined effects of a series of impairments including coronary disease, a rotator cuff injury, degenerative disc and joint disease, as well as depression and anxiety. (Tr. 427-38). This opinion from the sole examining source would have dictated a finding of disability under the Commissioner's regulations. The Administrative Law Judge ("ALJ"), however, denied this claim, finding that Dunn could perform light work. In reaching this result, the ALJ found the opinion of a non-examining source who did not even address Dunn's rotator cuff injury more persuasive that the views expressed by the examining consulting source. The ALJ also wholly discounted Dunn's shoulder injury, describing it as a non-severe impairment, and found the examining source opinion unpersuasive based upon a characterization of that opinion that was not fully supported by substantial evidence. Finally, while the ALJ

---

[1] 20 C.F.R. § Pt. 404, Subpt. P, App. 2

found the non-examining source medical opinion to be persuasive, the ALJ rejected one of the principal findings of that medical expert regarding the severity of Dunn's gastro-intestinal impairments.

For ALJs, Social Security disability determinations frequently entail an informed assessment of competing medical opinions coupled with an evaluation of a claimant's subjective complaints. Once the ALJ completes this task, on appeal it is the duty and responsibility of the district court to review these ALJ findings, judging the findings against a deferential standard of review which simply asks whether the ALJ's decision is supported by substantial evidence in the record, see 42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012), a quantum of proof which "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). This informed assessment by the ALJ, however, must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981).

While we regard this as a close issue, in the instant case we conclude that the ALJ's assessment of this evidence does not satisfy the burden of articulation

3

mandated by law.  Therefore, we cannot conclude that substantial evidence supports the ALJ's decision in this case. Accordingly, we will remand this case for further consideration by the Commissioner.

## II.   <u>Statement of Facts</u>

On September 7, 2018, Tanya Dunn applied for benefits pursuant to Titles II and XVI of the Social Security Act, alleging a date of onset of disability beginning on July 31, 2018. (Tr. 12). Dunn was born in 1968 and was 50 years old at the time of the alleged onset of her disability, making her an individual closely approaching advanced age under the Commissioner's regulations. (Tr. 21). Dunn had prior employment as a nursing and home health aide, semi-skilled work performed at a medium to heavy exertional level.  (Tr. 20-1). Dunn also had a limited education and had not completed high school. (Tr. 21, 35).

The combination of Dunn's somewhat advanced age and her limited education was legally significant under the Commissioner's regulations. Specifically, under these regulations given Dunn's age and her education, if she was limited to performing sedentary work, then the Commissioner's medical-vocational grids would deem her disabled. 20 C.F.R. § Pt. 404, Subpt. P, App. 2.

As part of the disability application process, on October 18, 2018, in a field office interview Dunn alleged that she was limited to performing sedentary work

4

due to a cascading array of medical and emotional impairments, including gastro-intestinal conditions, depression, kidney stones, coronary conditions, herniated discs, and a right rotator cuff injury. (Tr. 169). Notably, from the outset of this disability process Dunn reported this rotator cuff injury among her disabling medical conditions. Moreover, July 16, 2019 treatment notes from Dunn's primary care physician indicated that Dunn described this rotator cuff condition as a longstanding injury that Dunn had experienced in a fall some two years earlier. (Tr. 493-94).

Dunn's medical history revealed that she had received emergency room treatment for these conditions on at least three occasions during the eight-month period between December of 2017 and August of 2018. (Tr. 237-341). Moreover, on August 3, 2018, she was seen at the Williamsport Hospital complaining of chest pain. (Tr. 357-63). At that time the clinical impression of the attending physician was that "[w]ith her chest pain and positive troponin, she has non-ST-elevation myocardial infarction." (Tr. 363).[2]

Dunn also experienced pain, weakness, and instability in her cervical, thoracic, and lumbosacral spine and her knee. Between May and September of 2019, Dunn was seen and treated for these conditions by her primary care doctor on five

---

[2] A positive troponin would be a possible indicator of a heart attack, and a non-ST-elevation myocardial infarction is a form of heart attack.

separate occasions. (Tr. 483-508). In these clinical encounters, Dunn's physicians recorded that she suffered from cervical, thoracic, and lumbosacral pain which was occasionally described as severe and attributed in part to an August 2019 automobile accident following the death of her son. In these appointments, Dunn also recounted her rotator cuff injury and instances in which her knee would give out unexpectedly. Examinations conducted during these appointments documented Dunn's pain and her restricted range of motion. (Id.)

On January 17, 2019, as part of the disability evaluation process Dunn was examined by Dr. Ahmed Kneifati. (Tr. 427-43). Dr. Kneifati was the only physician to opine on Dunn's limitations who actually examined the plaintiff. In his report of examination, Dr. Kneifati concluded that Dunn suffered from hypertension, coronary artery disease, a heart attack, as well as cervical and lumbar back pain, knee pain, a rotator cuff injury, depression, and gastro-intestinal problems. (Tr. 431). While Dr. Kneifati indicated that Dunn was not in any acute distress and was able to rise from a chair and did not need assistance getting on or off the exam table, he reported that she had a mildly antalgic gait, had difficulty standing on toes and heels, could not walk on toes and heels, and had a limited ability to squat. (Tr. 429). The doctor also found that her spinal range of motion was somewhat constricted, (Tr.

441), and that she had a reduced range of motion in her right shoulder, a finding that was consistent with her report of a rotator cuff injury in her right shoulder. (Tr. 440).

Dr. Kneifati also found that Dunn was essentially limited to performing sedentary work. Thus, according to the doctor, Dunn could only occasionally life and carry up to ten pounds and could never lift or carry greater weights. (Tr. 433). Dr. Kneifati also concluded that Dunn could only sit for two hours and stand for one hour at a time. Further the doctor found that in an eight-hour work day, she could sit for four hours, stand for three hours, and walk for two hours. (Tr. 434). Finally, Dr. Kneifati opined that Dunn could never reach overhead with her right arm. (Tr. 435).

One month later, on February 14, 2019, a non-examining state agency expert, Dr. David Hutz, submitted a disability determination regarding Ms. Dunn. (Tr. 85-95). Based solely upon a review of Dunn's medical records, Dr. Hutz concluded that she could perform light work. (Tr. 91-93). In reaching this conclusion, Dr. Hutz found that Dunn's back disorders and gastro-intestinal impairments were medically determinable and severe but concluded that they were not wholly disabling. (Tr. 89). Notably, Dr. Hutz made no mention of Dunn's rotator cuff injury in his severity analysis. Nor did the doctor consider Dunn's coronary condition when assessing the severity of her physical impairments. (Id.)

7

Based upon this medical record, an ALJ conducted a hearing on Dunn's disability claim on October 18, 2019. (Tr. 26-73). During this hearing, Dunn and a vocational expert appeared and testified. (Id.) At the outset of this proceeding, Dunn's counsel requested that the ALJ find that Dunn could only perform sedentary work. (Tr. 32). Counsel also highlighted for the ALJ the fact that Dunn experienced coronary conditions and a rotator cuff injury in addition to her other presenting medical impairments. (Tr. 32).

Dunn testified at this hearing, describing her impairments and limitations. (Tr. 33-62). In the course of this testimony, Dunn described her rotator cuff injury as a longstanding impairment, stating that she had stopped working two or three years earlier when she suffered her rotator cuff injury, and testifying that "[m]y shoulder ain't been right since." (Tr. 38). Later, Dunn elaborated upon this testimony, stating that "I'm having a problem with it again." (Tr. 40). When the ALJ asked for further details regarding her latest shoulder injury, Dunn explained that "like a week ago, it just came out of nowhere." (Id.) Taken as a whole, this testimony indicated that Dunn had a longstanding rotator cuff injury, and her symptoms had been exacerbated recently.

Following this hearing, on February 19, 2020, the ALJ issued a decision denying Dunn's application for benefits. (Tr. 9-22). In this decision the ALJ first

found that Dunn met the insured requirements of the Act through December 31, 2020 and had not engaged in substantial gainful activity since the July 31, 2018 alleged date of onset of her disability. (Tr. 14). At Step 2 of the sequential analysis which governs disability claims the ALJ determined that Dunn's degenerative disc disease/degenerative joint disease/osteoarthritis of the lumbar spine, depression, and anxiety were all severe impairments. (Tr. 15).

This Step 2 analysis was curious, however, in several respects. First, the ALJ rejected the opinion of the state agency expert, Dr. Hutz, that Dunn's gastro-intestinal impairments were severe, finding instead that "these conditions were being managed medically" and therefore were not severe. (Id.) At Step 2 the ALJ also seemingly discounted Dr. Kneifati's conclusion that Dunn's rotator cuff injury was a severe impairment, observing instead that "the claimant testified that she just started hurting again the week prior to the hearing." (Id.) This characterization of Dunn's testimony, which suggested that her rotator cuff injury was a recent condition, ignored the fact that Dunn testified that she had stopped working two or three years earlier when she suffered this rotator cuff injury, and stated that "[m]y shoulder ain't been right since." (Tr. 38). The ALJ also appeared to discount Dr. Kneifati's finding that Dunn had severe coronary impairments, concluding that "the claimant's alleged heart attack and carpal tunnel syndrome are not medically

9

determinable impairments because they are not supported by the medical evidence of record." (Id.) Yet, in reaching this conclusion the ALJ did not address, or even acknowledge, the fact that on August 3, 2018 when Dunn was seen at the Williamsport Hospital complaining of chest pain the clinical impression of the attending physician was that "[w]ith her chest pain and positive troponin, she has non-ST-elevation myocardial infarction." (Tr. 363). Having discounted all of these conditions as non-severe at Step 2, these impairments then received scant attention in the ALJ's subsequent analysis of Ms. Dunn's claims.

At Step 3, the ALJ determined that none of Dunn's medical impairments met the severity of a listed impairment under the Commissioner's regulations. (Tr. 15-17). Between Step 3 and 4, the ALJ then crafted the following residual functional capacity assessment for Dunn:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional limitations. The claimant is limited to no more than frequent stooping, crouching, and climbing on ramps and stairs, but never kneeling or crawling and never climbing ladders, ropes, or scaffolds. The claimant must avoid unprotected heights and dangerous moving machinery. The claimant must avoid overhead reaching with the bilateral upper extremities. The claimant is limited to no more than frequent reaching in all other directions with the bilateral upper extremities. The claimant must avoid concentrated exposure to dusts, fumes, gases, and other pulmonary irritants. The claimant must avoid exposure to extreme temperatures, extreme humidity, wetness, and vibration. The claimant is limited to simple routine tasks generally

described as unskilled work, but not at a production rate pace. The claimant is limited to occupations requiring no more than simple work-related decisions with no more than occasional changes in the work setting. The claimant is limited to no more than occasional interaction with supervisors, co-workers, and the public.

(Tr. 17-18).

In reaching this RFC, the ALJ also discussed the medical opinion evidence. At the outset, the ALJ rejected the opinion of the only physician who actually examined Dunn, Dr. Kneifati, stating:

> After examining the claimant, Dr. Monfared indicated that she could occasionally lift/carry up to 10 pounds, sit 4 hours in 2-hour intervals, stand 3 hours in 1-hour intervals, and walk 2 hours in 10-minute intervals total in an 8-hour workday (Exhibit 7F). The undersigned does not find this opinion persuasive because it is based heavily on the claimant's subjective complaints as opposed to objective clinical findings. In fact, Dr. Monfared's cardiac diagnoses are not supported at all, which further shows a reliance on the claimant's statements. Additionally, this limitation to sedentary work is not supported by Dr. Monfared's own examination findings that showed no distress, no assistive devices, the ability to rise from chair and exam table without difficulty, stable joints, full strength in the upper and lower extremities, no muscle atrophy, and full grip strength bilaterally (Exhibit 7F/5-6). Dr. Monfared's opinion is also not consistent with or supported by the other evidence of record, including mild imaging results and essentially normal clinical findings (Exhibit 10F).

(Tr. 20).

The ALJ's treatment of this examining source opinion was suspect on at least three scores. First, the ALJ misidentified this examining physician, calling him Dr. Monfared instead of Dr. Kneifati. Further, the ALJ's proffered justification for

discounting this opinion appeared to misstate the evidence. Specifically, the ALJ stated that Dr. Kneifati's opinion was "based heavily on the claimant's subjective complaints as opposed to objective clinical findings." (Id.) The ALJ supported this finding by citing the fact that the doctor's "cardiac diagnoses are not supported at all, which further shows a reliance on the claimant's statements." (Id.) Yet, the ALJ's assertion that Dr. Kneifati's "cardiac diagnoses are not supported at all" appears to be incorrect since it failed to consider the August 3, 2018 clinical impression of Dunn's attending physician at the Williamsport Hospital, who stated that "[w]ith her chest pain and positive troponin, she has non-ST-elevation myocardial infarction." (Tr. 363).

Finally, the ALJ's description of Dr. Kneifati's clinical findings was both selective and incomplete. To be sure, the ALJ observed that Dr. Kneifati's report of the examination of Dunn showed no distress, no use of assistive devices, the ability to rise from chair and exam table without difficulty, stable joints, full strength in the upper and lower extremities, no muscle atrophy, and full grip strength bilaterally. However, the ALJ neglected to mention that Dr. Kneifati also reported that Dunn had a mildly antalgic gait, had difficulty standing on toes and heels, could not walk on toes and heels, had a limited ability to squat (Tr. 429); did not mention that the doctor also found that her spinal range of motion was somewhat constricted (Tr.

12

441); and failed to disclose that she had a reduced range of motion in her right shoulder, a finding that was consistent with her report of a rotator cuff injury in her right shoulder. (Tr. 440).

Having concluded that Dr. Kneifati's medical opinion—the only opinion tendered by a physician who actually examined Dunn—was unpersuasive, the ALJ gave greater credence to Dr. Hutz' non-examining source opinion, stating:

> [T]he undersigned considered the opinion of the State agency medical consultant, Dr. Hutz, who indicated that the claimant would be capable of a range of light duty work with occasional postural maneuvers, but never climbing ladders, ropes, or scaffolds and avoidance of concentrated exposure to extreme cold, extreme heat, wetness, vibration, or hazards (Exhibits 1A; 2A). The undersigned finds this opinion persuasive, as it is supported by and consistent with the medical evidence of record and activities of daily living previously discussed.

(Tr. 19-20). Yet, while the ALJ deemed Dr. Hutz's opinion to be persuasive, the ALJ discounted one important aspect of that opinion—Dr. Hutz's finding that Dunn suffered from severe gastro-intestinal impairments—without any discussion or analysis.

Having reached these conclusions, the ALJ concluded that Dunn could not perform her past work. (Tr. 20). The ALJ also rejected the view of Dr. Kneifati that Dunn was limited to sedentary work, a medical opinion that would have been tantamount to a finding of disability for this aged worker. (Id.) Instead, the ALJ

13

determined that Dunn could perform a range of light work and concluded that she was not disabled. (Tr. 17-18, 21-22).

This appeal followed. (Doc. 1). On appeal, Dunn argues that the ALJ's decision was flawed in a number of respects, including the Step 2 analysis of Dunn's severe impairments, as well as the evaluation of the medical opinion evidence. (Doc. 19). While we regard this as a close issue, in the instant case we conclude that the ALJ's Step 2 evaluation and the assessment of the medical opinion evidence does not satisfy the burden of articulation mandated by law. Therefore, we cannot conclude that substantial evidence supports the ALJ's decision in this case. Accordingly, we will remand this case for further consideration by the Commissioner.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but

rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law.  See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence." )(alterations omitted); Burton v. Schweiker, 512 F.

Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employy

16

particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.    <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Title II of the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show

17

that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e),  404.1545(a)(1),  416.920(e),  416.945(a)(1).   In  making  this assessment,  the  ALJ  considers  all  of  the  claimant's  medically  determinable

18

impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

19

physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by

substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113, 129 (3d Cir. 2002); <u>see also</u> <u>Metzger v. Berryhill</u>, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom.</u> <u>Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and</u> <u>recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064.  Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence

standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  <u>Id</u>. at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding."  <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir. 1999).

### C.   **Step 2 Analysis**

Step 2 of this sequential analysis is often the first substantive benchmark an ALJ must address and is governed by familiar legal standards:

> With respect to this threshold showing of a severe impairment, the showing required by law has been aptly described in the following terms: "In order to meet the step two severity test, an impairment need only cause a slight abnormality that has no more than a minimal effect on the ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921; S.S.R. 96–3p, 85–28. The Third Circuit Court of Appeals has held that the step two severity inquiry is a *'de minimus* screening device to dispose of groundless claims.' <u>McCrea v. Comm. of Soc. Sec.</u>,370 F.3d 357, 360 (3d Cir.2004); <u>Newell v. Comm. of Soc. Sec.</u>, 347 F.3d 541, 546 (3d Cir.2003). 'Any doubt as to whether this showing has been made is to be resolved in favor of the applicant.' <u>Id</u>.*"* <u>Velazquez v. Astrue</u>, No. 07–5343, 2008 WL 4589831, *3 (E.D.Pa., Oct.15, 2008). Thus, "[t]he claimant's burden at step two is 'not an exacting one.' <u>McCrea v. Comm'r of Soc. Sec.</u>, 370 F.3d 357, 360 (3d Cir.2004). This step should be 'rarely utilized' to deny benefits. <u>Id</u>. at 361. Rather, ... [a]n individual should be denied benefits at step two only if the

impairment he presents is a 'slight abnormality' that has 'no more than a minimal effect on [his] ability to work.' Id*.*" Kinney v. Comm'r of Soc. Sec*.*, 244 F. App'x 467, 469–70 (3d Cir.2007). Accordingly, "[d]ue to this limited function, the Commissioner's determination to deny an applicant's request for benefits at step two should be reviewed with close scrutiny." McCrea v. Commissioner of Social Sec*.*, 370 F.3d 357, 360 (3d Cir.2004).

Dotzel v. Astrue, No. 1:12-CV-1281, 2014 WL 1612508, at *4 (M.D. Pa. Apr. 22, 2014). Furthermore,

> [E]ven if an ALJ erroneously determines at step two that one impairment is not "severe," the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five. However, where it appears that the ALJ's error at step two also influenced the ALJ's RFC analysis, the reviewing court may remand the matter to the Commissioner for further consideration. See Nosse v. Astrue, No. 08–[CV–1173, 2009 WL 2986612, *10] (W.D.Pa. Sept.17, 2009).

> McClease v. Comm. of Soc. Sec*.*, No. 8–CV–1673, 2009 WL 3497775, *10 (E.D. Pa. Oct. 28, 2009); see also Salles v. Comm. of Soc. Sec*.*, 229 Fed. App'x 140, 145, n. 2 (3d Cir. 2007) (citing Rutherford v. Barnhart*,* 399 F.3d 546, 553 (3d Cir. 2005) ("Because the ALJ found in Salles's favor at Step Two, even if he had erroneously concluded that some of her impairments were non-severe, any error was harmless.").

Stouchko v. Comm'r of Soc. Sec., No. 1:12-CV-1318, 2014 WL 888513, at *10 (M.D. Pa. Mar. 6, 2014). Simply put, "because step two is to be rarely utilized as basis for the denial of benefits, [] its invocation is certain to raise a judicial eyebrow." McCrea v. Comm'r of Soc. Sec*.*, 370 F.3d 357, 361 (3d Cir. 2004) (citing SSR 85–

23

28, 1995 WL 56856, at *4 ('Great care should be exercised in applying the not severe impairment concept')).

## D.   <u>Evaluation of Medical Opinions</u>

The plaintiff filed this disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March 0f 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u> ("<u>Revisions to Rules</u>"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency;

24

relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions " the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the

different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is

no evidence of any credible medical opinion supporting a claimant's allegations of

disability "the proposition that an ALJ must always base his RFC on a medical

opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### E.   This Case Will Be Remanded for Further Consideration and Articulation of the Grounds for the ALJ's Decision.

As we have noted, it is axiomatic that an ALJ's decision must be accompanied

by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642

F.2d at 704. Furthermore, the ALJ must also "indicate in his decision which evidence

he has rejected and which he is relying on as the basis for his finding." Schaudeck,

181 F.3d at 433. Moreover, "because step two is to be rarely utilized as basis for the

denial of benefits, [] its invocation is certain to raise a judicial eyebrow." McCrea,

370 F.3d at 361.

Judged by these legal benchmarks we conclude that there are a series of

ambiguities in the ALJ's decision which, in combination, compel a remand of this

case. Initially, we believe that the ALJ's Step 2 analysis is incomplete and

inadequate, and is flawed in at least three ways. First, even though the ALJ

pronounced the opinion of Dr. Hutz, the state agency expert, persuasive the ALJ

rejected the doctor's well supported opinion that Dunn's gastro-intestinal impairments were severe, finding instead that "these conditions were being managed medically" and therefore were not severe. (Id.)

Second, at Step 2 the ALJ also seemingly discounted Dr. Kneifati's conclusion that Dunn's rotator cuff injury was a severe impairment, observing instead that "the claimant testified that she just started hurting again the week prior to the hearing." (Id.) This characterization of Dunn's testimony, which suggested that her rotator cuff injury was a recent condition, ignored the fact that Dunn testified that she had stopped working two or three years earlier when she suffered this rotator cuff injury, and stated that "[m]y shoulder ain't been right since." (Tr. 38).

Finally, the ALJ also appeared to discount Dr. Kneifati's finding that Dunn had severe coronary impairments, concluding that "the claimant's alleged heart attack and carpal tunnel syndrome are not medically determinable impairments because they are not supported by the medical evidence of record." (Id.) Yet, in reaching this conclusion the ALJ did not address, or even acknowledge, the fact that on August 3, 2018 when Dunn was seen at the Williamsport Hospital complaining of chest pain, the clinical impression of the attending physician was that "[w]ith her chest pain and positive troponin, she has non-ST-elevation myocardial infarction." (Tr. 363).

28

The ALJ then compounded these Step 2 errors by giving this array of medical impairments scant attention in the subsequent analysis of Dunn's case. Thus, the ALJ's overall analysis of this case does not rehabilitate these Step 2 errors. Accordingly, in the instant case, we conclude that the ALJ's RFC determination is not supported by an adequate explanation. Mindful of the fact that the Third Circuit Court of Appeals has held that the Step 2 severity inquiry is a *de minimus* screening device to dispose of groundless claims and any doubt as to whether this showing has been made is to be resolved in favor of the applicant, McCrea, 370 F.3d at 360, we find that these Step 2 errors undermine confidence in the analysis of this claim and caution in favor of a remand.

These Step 2 errors were then compounded by the ALJ's medical opinion evaluation in this case. This evaluation discounted the opinion of the only examining medical source, Dr. Kneifati, in favor of a non-treating, non-examining source, Dr. Hutz. In our view, the ALJ's consideration of this medical opinion evidence was flawed in at least four ways.

First, the ALJ deemed Dr. Hutz's opinion persuasive, but then without explanation rejected a major aspect of that opinion; namely, Dr. Hutz's finding that Dunn's gastro-intestinal ailments were a severe impairment. The ALJ's decision does not even acknowledge this apparent inconsistency between the ALJ's

evaluation of this opinion and the ALJ's rejection of one of the material findings made by Dr. Hutz. Thus, we are left with a decision which pronounces one doctor's opinion persuasive even though the ALJ is apparently not persuaded by one significant aspect of that medical opinion. More is needed here.

Second, in this decision the ALJ misidentified this examining physician, calling him Dr. Monfared instead of Dr. Kneifati. Third, the ALJ's basis for discounting Dr. Kneifati's examining source opinion appeared to be based upon an incomplete evaluation of the evidence. Specifically, the ALJ stated that Dr. Kneifati's opinion was "based heavily on the claimant's subjective complaints as opposed to objective clinical findings." (Id.) The ALJ supported this finding by citing the fact that the doctor's "cardiac diagnoses are not supported at all, which further shows a reliance on the claimant's statements." (Id.) Yet, the ALJ's assertion that Dr. Kneifati's "cardiac diagnoses are not supported at all" appears to be incorrect since it failed to consider the August 3, 2018 clinical impression of Dunn's attending physician at the Williamsport Hospital, who stated that "[w]ith her chest pain and positive troponin, she has non-ST-elevation myocardial infarction." (Tr. 363).

Finally, the ALJ's description of Dr. Kneifati's clinical findings was both selective and incomplete. To be sure, the ALJ observed that Dr. Kneifati's report of

the examination of Dunn showed no distress, no use of assistive devices, the ability to rise from chair and exam table without difficulty, stable joints, full strength in the upper and lower extremities, no muscle atrophy, and full grip strength bilaterally. However, the ALJ neglected to mention that Dr. Kneifati also reported that Dunn had a mildly antalgic gait, had difficulty standing on toes and heels, could not walk on toes and heels, had a limited ability to squat (Tr. 429); did not mention that the doctor also found that her spinal range of motion was somewhat constricted (Tr. 441); and failed to disclose that she had a reduced range of motion in her right shoulder, a finding that was consistent with her report of a rotator cuff injury in her right shoulder. (Tr. 440).

Further, this flawed Step 2 analysis and incomplete medical opinion evaluation have even greater significance due to the fact that Dunn was an individual closely approaching advanced age, since the Secretary has promulgated guidelines on disability determinations that account for a claimant's physical abilities, age, education, and vocational skills as well as other factors, such as their RFC. See 20 C.F.R., Part 404, Subpart P, Appendix 2. These guidelines prescribe various grids, and persons who fall within the grids may be defined as disabled by application of these rules. This rule-making process relieves the Secretary of the need to rely on vocational experts by establishing, through rulemaking, the types and numbers of

jobs that exist in the national economy where a claimant's qualifications correspond to the job requirements identified by a particular rule. Heckler v. Campbell, 461 U.S. 458, 461–62, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). These regulations provide that the grids will direct a conclusion as to whether an individual is or is not disabled where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule. 20 C.F.R. pt. 404 Subpt. P Appx. 2, § 200(a).

Under these Medical Vocational guidelines, if Dunn—a person who is closely approaching advanced age—was found to be able to only undertake sedentary work—a conclusion reached by Dr. Kneifati the only physician who actually examined Dunn—then the grids mandated a finding that she was disabled. See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201.12. Thus, resolution of these inconsistencies could change the outcome of this case since, if the ALJ found that Dunn could only perform sedentary work, the grids compel a determination that she was disabled. When apparent internal inconsistencies in an ALJ's residual functional capacity assessment may have an outcome determinative impact upon a social security determination under the Medical Vocational Guideline grids, courts recognize that a remand to clarify these inconsistencies is often necessary. Compare Campbell v. Astrue, Civ. No. 09–5356, 2010 WL 4689521 (E.D. Pa. Nov.2, 2010),

with <u>Anderson v. Astrue</u>, 825 F.Supp.2d 487, 496 (D. Del. 2011). In this case, since the difference between a residual functional capacity to perform either sedentary work or work at any other exertional levels may determine the outcome of this case, and the ALJ's assessment of Dunn's residual functional capacity is marked by these internal inconsistencies, a remand of this case is required to clarify this question.

Finally, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand. Further because we have concluded that a remand is necessary on these grounds, we do not reach any other claims of error advanced by Dunn. Those other issues may be addressed in the first instance by the ALJ on remand.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that this case be REMANDED for further consideration of the Plaintiff's application.

An appropriate order follows.

*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: December 12, 2022